(Slip Opinion)    OCTOBER TERM, 2009    1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## DOE ET AL. *v.* REED, WASHINGTON SECRETARY OF STATE, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 09–559.   Argued April 28, 2010—Decided June 24, 2010

The Washington Constitution allows citizens to challenge state laws by referendum. To initiate a referendum, proponents must file a petition with the secretary of state that contains valid signatures of registered Washington voters equal to or exceeding four percent of the votes cast for the office of Governor at the last gubernatorial election. A valid submission requires not only a signature, but also the signer's address and the county in which he is registered to vote.

In May 2009, Washington Governor Christine Gregoire signed into law Senate Bill 5688, which expanded the rights and responsibilities of state-registered domestic partners, including same-sex domestic partners. That same month, Protect Marriage Washington, one of the petitioners here, was organized as a "State Political Committee" for the purpose of collecting the petition signatures necessary to place a referendum challenging SB 5688 on the ballot. If the referendum made it onto the ballot, Protect Marriage Washington planned to encourage voters to reject SB 5688. Protect Marriage Washington submitted the petition with more than 137,000 signatures to the secretary of state, and after conducting the verification and canvassing process required by state law, the secretary determined that the petition contained sufficient signatures to qualify the referendum (R–71) for the ballot. Respondent intervenors invoked the Washington Public Records Act (PRA) to obtain copies of the petition, which contained the signers' names and addresses.

The R–71 petition sponsor and certain signers filed a complaint and a motion for injunctive relief in Federal District Court, seeking to enjoin the public release of the petition. Count I alleges that the PRA "is unconstitutional as applied to referendum petitions," and Count II

alleges that the PRA "is unconstitutional as applied to the Referendum 71 petition because there is a reasonable probability that the signatories . . . will be subjected to threats, harassment, and reprisals." Determining that the PRA burdened core political speech, the District Court held that plaintiffs were likely to succeed on the merits of Count I and granted a preliminary injunction preventing release of the signatory information. Reviewing only Count I, the Ninth Circuit held that plaintiffs were unlikely to succeed on their claim that the PRA is unconstitutional as applied to referendum petitions in general, and therefore reversed.

*Held:* Disclosure of referendum petitions does not as a general matter violate the First Amendment. Pp. 4–13.

(a) Because plaintiffs' Count I claim and the relief that would follow—an injunction barring the secretary of state from releasing referendum petitions to the public—reach beyond the particular circumstances of these plaintiffs, they must satisfy this Court's standards for a facial challenge to the extent of that reach. See *United States* v. *Stevens*, 559 U. S. ___, ___. Pp. 4–5.

(b) The compelled disclosure of signatory information on referendum petitions is subject to review under the First Amendment. In most cases, the individual's signature will express the view that the law subject to the petition should be overturned. Even if the signer is agnostic as to the merits of the underlying law, his signature still expresses the political view that the question should be considered "by the whole electorate." *Meyer* v. *Grant*, 486 U. S. 414, 421. In either case, the expression of a political view implicates a First Amendment right.

Petition signing remains expressive even when it has legal effect in the electoral process. But that does not mean that the electoral context is irrelevant to the nature of this Court's First Amendment review. States have significant flexibility in implementing their own voting systems. To the extent a regulation concerns the legal effect of a particular activity in that process, the government is afforded substantial latitude to enforce that regulation. Also pertinent is the fact that the PRA is not a prohibition on speech, but a *disclosure* requirement that may burden "the ability to speak, but [does] 'not prevent anyone from speaking.'" *Citizens United* v. *Federal Election Comm'n*, 558 U. S. ___, ___. This Court has reviewed First Amendment challenges to disclosure requirements in the electoral context under an "exacting scrutiny" standard, requiring "a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest." *Id.*, at ___. To withstand this scrutiny, "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Davis* v. *Fed-*

*eral Election Comm'n*, 554 U. S. \_\_\_, \_\_\_. Pp. 5–7.

(c) The State's interest in preserving the integrity of the electoral process suffices to defeat the argument that the PRA is unconstitutional with respect to referendum petitions in general. That interest is particularly strong with respect to efforts to root out fraud. But the State's interest is not limited to combating fraud; it extends to efforts to ferret out invalid signatures caused not by fraud but by simple mistake, such as duplicate signatures or signatures of individuals who are not registered to vote in the State. The State's interest also extends more generally to promoting transparency and accountability in the electoral process.

Plaintiffs contend that disclosure is not sufficiently related to the interest of protecting the integrity of the electoral process to withstand First Amendment scrutiny. They argue that disclosure is not necessary because the secretary of state is already charged with verifying and canvassing the names on a petition, a measure's advocates and opponents can observe that process, any citizen can challenge the secretary's actions in court, and criminal penalties reduce the danger of fraud in the petition process. But the secretary's verification and canvassing will not catch all the invalid signatures, and public disclosure can help cure the inadequacies of the secretary's process. Disclosure also helps prevent difficult-to-detect fraud such as outright forgery and "bait and switch" fraud, in which an individual signs the petition based on a misrepresentation of the underlying issue. And disclosure promotes transparency and accountability in the electoral process to an extent other measures cannot. Pp. 8–10.

(d) Plaintiffs' main objection is that "the strength of the governmental interest" does not "reflect the seriousness of the actual burden on First Amendment rights." *Davis, supra,* at \_\_\_. According to plaintiffs, the objective of those seeking disclosure is not to prevent fraud, but to publicly identify signatories and broadcast their political views on the subject of the petition. Plaintiffs allege, for example, that several groups plan to post the petitions in searchable form on the Internet, and then encourage other citizens to seek out R–71 petition signers. That, plaintiffs argue, would subject them to threats, harassment, and reprisals.

The problem for plaintiffs is that their argument rests almost entirely on the specific harm that would attend the disclosure of information on the R–71 petition. But the question before the Court at this stage of the litigation is whether disclosure of referendum petitions in general violates the First Amendment. Faced with the State's unrebutted arguments that only modest burdens attend the disclosure of a typical petition, plaintiffs' broad challenge to the PRA must be rejected. But upholding the PRA against a broad-based chal-

lenge does not foreclose success on plaintiffs' narrower challenge in
Count II, which is pending before the District Court. See *Buckley* v.
*Valeo*, 424 U. S. 1, 74. Pp. 10–13.

586 F. 3d 671, affirmed.

ROBERTS, C. J., delivered the opinion of the Court, in which KENNEDY,
GINSBURG, BREYER, ALITO, and SOTOMAYOR, JJ., joined. BREYER, J., and
ALITO, J., filed concurring opinions. SOTOMAYOR, J., filed a concurring
opinion, in which STEVENS and GINSBURG, JJ., joined. STEVENS, J., filed
an opinion concurring in part and concurring in the judgment, in which
BREYER, J., joined. SCALIA, J., filed an opinion concurring in the judg-
ment. THOMAS, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 09–559

JOHN DOE #1, ET AL., PETITIONERS *v.* SAM REED, WASHINGTON SECRETARY OF STATE, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 24, 2010]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

The State of Washington allows its citizens to challenge state laws by referendum. Roughly four percent of Washington voters must sign a petition to place such a referendum on the ballot. That petition, which by law must include the names and addresses of the signers, is then submitted to the government for verification and canvassing, to ensure that only lawful signatures are counted. The Washington Public Records Act (PRA) authorizes private parties to obtain copies of government documents, and the State construes the PRA to cover submitted referendum petitions.

This case arises out of a state law extending certain benefits to same-sex couples, and a corresponding referendum petition to put that law to a popular vote. Respondent intervenors invoked the PRA to obtain copies of the petition, with the names and addresses of the signers. Certain petition signers and the petition sponsor objected, arguing that such public disclosure would violate their rights under the First Amendment.

The course of this litigation, however, has framed the legal question before us more broadly. The issue at this stage of the case is not whether disclosure of this particular petition would violate the First Amendment, but whether disclosure of referendum petitions in general would do so. We conclude that such disclosure does not as a general matter violate the First Amendment, and we therefore affirm the judgment of the Court of Appeals. We leave it to the lower courts to consider in the first instance the signers' more focused claim concerning disclosure of the information on this particular petition, which is pending before the District Court.

## I

The Washington Constitution reserves to the people the power to reject any bill, with a few limited exceptions not relevant here, through the referendum process. Wash. Const., Art. II, §1(b). To initiate a referendum, proponents must file a petition with the secretary of state that contains valid signatures of registered Washington voters equal to or exceeding four percent of the votes cast for the office of Governor at the last gubernatorial election. §§1(b), (d). A valid submission requires not only a signature, but also the signer's address and the county in which he is registered to vote. Wash. Rev. Code §29A.72.130 (2008).

In May 2009, Washington Governor Christine Gregoire signed into law Senate Bill 5688, which "expand[ed] the rights and responsibilities" of state-registered domestic partners, including same-sex domestic partners. 586 F. 3d 671, 675 (CA9 2009). That same month, Protect Marriage Washington, one of the petitioners here, was organized as a "State Political Committee" for the purpose of collecting the petition signatures necessary to place a referendum on the ballot, which would give the voters themselves an opportunity to vote on SB 5688. App. 8–9. If the referen-

dum made it onto the ballot, Protect Marriage Washington planned to encourage voters to reject SB 5688. *Id.*, at 7, 9.

On July 25, 2009, Protect Marriage Washington submitted to the secretary of state a petition containing over 137,000 signatures. See 586 F. 3d, at 675; Brief for Respondent Washington Families Standing Together 6. The secretary of state then began the verification and canvassing process, as required by Washington law, to ensure that only legal signatures were counted. Wash. Rev. Code §29A.72.230. Some 120,000 valid signatures were required to place the referendum on the ballot. Sam Reed, Washington Secretary of State, Certification of Referendum 71 (Sept. 2, 2009). The secretary of state determined that the petition contained a sufficient number of valid signatures, and the referendum (R–71) appeared on the November 2009 ballot. The voters approved SB 5688 by a margin of 53% to 47%.

The PRA, Wash. Rev. Code §42.56.001 *et seq.*, makes all "public records" available for public inspection and copying. §42.56.070(1) (2008). The Act defines "[p]ublic record" as "any writing containing information relating to the conduct of government or the performance of any governmental or proprietary function prepared, owned, used, or retained by any state or local agency." §42.56.010(2). Washington takes the position that referendum petitions are "public records." Brief for Respondent Reed 5.

By August 20, 2009, the secretary had received requests for copies of the R–71 petition from an individual and four entities, including Washington Coalition for Open Government (WCOG) and Washington Families Standing Together (WFST), two of the respondents here. 586 F. 3d, at 675. Two entities, WhoSigned.org and Know-ThyNeighbor.org, issued a joint press release stating their intention to post the names of the R–71 petition signers online, in a searchable format. See App. 11; 586 F. 3d, at

675.

The referendum petition sponsor and certain signers filed a complaint and a motion for a preliminary injunction in the United States District Court for the Western District of Washington, seeking to enjoin the secretary of state from publicly releasing any documents that would reveal the names and contact information of the R–71 petition signers. App. 4. Count I of the complaint alleges that "[t]he Public Records Act is unconstitutional as applied to referendum petitions." *Id.,* at 16. Count II of the complaint alleges that "[t]he Public Records Act is unconstitutional as applied to the Referendum 71 petition because there is a reasonable probability that the signatories of the Referendum 71 petition will be subjected to threats, harassment, and reprisals." *Id.,* at 17. Determining that the PRA burdened core political speech, the District Court held that plaintiffs were likely to succeed on the merits of Count I and granted them a preliminary injunction on that count, enjoining release of the information on the petition. 661 F. Supp. 2d 1194, 1205–1206 (WD Wash. 2009).

The United States Court of Appeals for the Ninth Circuit reversed. Reviewing only Count I of the complaint, the Court of Appeals held that plaintiffs were unlikely to succeed on their claim that the PRA is unconstitutional as applied to referendum petitions generally. It therefore reversed the District Court's grant of the preliminary injunction. 586 F. 3d, at 681. We granted certiorari. 558 U. S. ___ (2010).

## II

It is important at the outset to define the scope of the challenge before us. As noted, Count I of the complaint contends that the PRA "violates the First Amendment as applied to referendum petitions." App. 16. Count II asserts that the PRA "is unconstitutional as applied to the

Referendum 71 petition." *Id.,* at 17. The District Court decision was based solely on Count I; the Court of Appeals decision reversing the District Court was similarly limited. 586 F. 3d, at 676, n. 6. Neither court addressed Count II.

The parties disagree about whether Count I is properly viewed as a facial or as-applied challenge. Compare Reply Brief for Petitioners 8 ("Count I expressly made an as-applied challenge"), with Brief for Respondent Reed 1 ("This is a facial challenge to Washington's Public Records Act"). It obviously has characteristics of both: The claim is "as applied" in the sense that it does not seek to strike the PRA in all its applications, but only to the extent it covers referendum petitions. The claim is "facial" in that it is not limited to plaintiffs' particular case, but challenges application of the law more broadly to all referendum petitions.

The label is not what matters. The important point is that plaintiffs' claim and the relief that would follow—an injunction barring the secretary of state "from making referendum petitions available to the public," App. 16 (Complaint Count I)—reach beyond the particular circumstances of these plaintiffs. They must therefore satisfy our standards for a facial challenge to the extent of that reach. See *United States* v. *Stevens*, 559 U. S. ___, ___ (2010) (slip op., at 10).

### III
### A

The compelled disclosure of signatory information on referendum petitions is subject to review under the First Amendment. An individual expresses a view on a political matter when he signs a petition under Washington's referendum procedure. In most cases, the individual's signature will express the view that the law subject to the petition should be overturned. Even if the signer is agnostic as to the merits of the underlying law, his signature

still expresses the political view that the question should
be considered "by the whole electorate." *Meyer* v. *Grant*,
486 U. S. 414, 421 (1988). In either case, the expression of
a political view implicates a First Amendment right. The
State, having "cho[sen] to tap the energy and the legiti-
mizing power of the democratic process, . . . must accord
the participants in that process the First Amendment
rights that attach to their roles." *Republican Party of
Minn.* v. *White*, 536 U. S. 765, 788 (2002) (internal quota-
tion marks and ellipsis omitted).

Respondents counter that signing a petition is a legally
operative legislative act and therefore "does not involve
any significant expressive element." Brief for Respondent
Reed 31. It is true that signing a referendum petition may
ultimately have the legal consequence of requiring the
secretary of state to place the referendum on the ballot.
But we do not see how adding such legal effect to an ex-
pressive activity somehow deprives that activity of its
expressive component, taking it outside the scope of the
First Amendment. Respondents themselves implicitly
recognize that the signature expresses a particular view-
point, arguing that one purpose served by disclosure is to
allow the public to engage signers in a debate on the mer-
its of the underlying law. See, *e.g.*, *id.,* at 45; Brief for
Respondent WCOG 49; Brief for Respondent WFST 58.

Petition signing remains expressive even when it has
legal effect in the electoral process. But that is not to say
that the electoral context is irrelevant to the nature of our
First Amendment review. We allow States significant
flexibility in implementing their own voting systems. See
*Burdick* v. *Takushi*, 504 U. S. 428, 433–434 (1992). To the
extent a regulation concerns the legal effect of a particular
activity in that process, the government will be afforded
substantial latitude to enforce that regulation. Also perti-
nent to our analysis is the fact that the PRA is not a pro-
hibition on speech, but instead a *disclosure* requirement.

"[D]isclosure requirements may burden the ability to speak, but they . . . do not prevent anyone from speaking." *Citizens United* v. *Federal Election Comm'n*, 558 U. S. \_\_\_, \_\_\_ (2010) (slip op., at 51) (internal quotation marks omitted).

We have a series of precedents considering First Amendment challenges to disclosure requirements in the electoral context. These precedents have reviewed such challenges under what has been termed "exacting scrutiny." See, *e.g.*, *Buckley* v. *Valeo*, 424 U. S. 1, 64 (1976) (*per curiam*) ("Since *NAACP* v. *Alabama* [357 U. S. 449 (1958),] we have required that the subordinating interests of the State [offered to justify compelled disclosure] survive exacting scrutiny"); *Citizens United*, *supra*, at \_\_\_ (slip op., at 51) ("The Court has subjected [disclosure] requirements to 'exacting scrutiny'" (quoting *Buckley*, *supra*, at 64)); *Davis* v. *Federal Election Comm'n*, 554 U. S. \_\_\_, \_\_\_ (2008) (slip op., at 18) (governmental interest in disclosure "'must survive exacting scrutiny'" (quoting *Buckley*, *supra*, at 64)); *Buckley* v. *American Constitutional Law Foundation, Inc.,* 525 U. S. 182, 204 (1999) (*ACLF*) (finding that disclosure rules "fail[ed] exacting scrutiny" (internal quotation marks omitted)).

That standard "requires a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest." *Citizens United*, *supra*, at \_\_\_ (slip op., at 51) (quoting *Buckley*, *supra*, at 64, 66). To withstand this scrutiny, "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Davis*, *supra*, at \_\_\_ (slip op., at 18) (citing *Buckley*, *supra*, at 68, 71).[1]

—————

[1] JUSTICE SCALIA doubts whether petition signing is entitled to any First Amendment protection at all. *Post*, at 1 (opinion concurring in judgment). His skepticism is based on the view that petition signing has "legal effects" in the legislative process, while other aspects of political participation—with respect to which we have held there is a

## B

Respondents assert two interests to justify the burdens of compelled disclosure under the PRA on First Amendment rights: (1) preserving the integrity of the electoral process by combating fraud, detecting invalid signatures, and fostering government transparency and accountability; and (2) providing information to the electorate about who supports the petition. See, *e.g.,* Brief for Respondent Reed 39–42, 44–45. Because we determine that the State's interest in preserving the integrity of the electoral process suffices to defeat the argument that the PRA is unconstitutional with respect to referendum petitions in general, we need not, and do not, address the State's "informational" interest.

The State's interest in preserving the integrity of the electoral process is undoubtedly important. "States allowing ballot initiatives have considerable leeway to protect the integrity and reliability of the initiative process, as they have with respect to election processes generally." *ACLF*, 525 U. S., at 191. The State's interest is particularly strong with respect to efforts to root out fraud, which not only may produce fraudulent outcomes, but has a systemic effect as well: It "drives honest citizens out of the democratic process and breeds distrust of our government." *Purcell* v. *Gonzalez*, 549 U. S. 1, 4 (2006) (*per curiam*); see also *Crawford* v. *Marion County Election Bd.*, 553 U. S. 181, 196 (2008) (opinion of STEVENS, J.). The

_____

First Amendment interest, see *supra*, at 5–7—do not. See *post*, at 3–4, and n. 3. That line is not as sharp as JUSTICE SCALIA would have it; he himself recognizes "the existence of a First Amendment interest in voting," *post*, at 6, which of course also can have legal effect. The distinction becomes even fuzzier given that only *some* petition signing has legal effect, and any such legal effect attaches only well after the expressive act of signing, if the secretary determines that the petition satisfies the requirements for inclusion on the ballot. See *post*, at 3. Petitions that do not qualify for the ballot of course carry no legal effect.

threat of fraud in this context is not merely hypothetical; respondents and their *amici* cite a number of cases of petition-related fraud across the country to support the point. See Brief for Respondent Reed 43; Brief for State of Ohio et al. as *Amici Curiae* 22–24.

But the State's interest in preserving electoral integrity is not limited to combating fraud. That interest extends to efforts to ferret out invalid signatures caused not by fraud but by simple mistake, such as duplicate signatures or signatures of individuals who are not registered to vote in the State. See Brief for Respondent Reed 42. That interest also extends more generally to promoting transparency and accountability in the electoral process, which the State argues is "essential to the proper functioning of a democracy." *Id.,* at 39.

Plaintiffs contend that the disclosure requirements of the PRA are not "sufficiently related" to the interest of protecting the integrity of the electoral process. Brief for Petitioners 51. They argue that disclosure is not necessary because the secretary of state is already charged with verifying and canvassing the names on a petition, advocates and opponents of a measure can observe that process, and any citizen can challenge the secretary's actions in court. See Wash. Rev. Code §§29A.72.230, 29A.72.240. They also stress that existing criminal penalties reduce the danger of fraud in the petition process. See Brief for Petitioners 50; §§29A.84.210, 29A.84.230, 29A.84.250.

But the secretary's verification and canvassing will not catch all invalid signatures: The job is large and difficult (the secretary ordinarily checks "only 3 to 5% of signatures," Brief for Respondent WFST 54), and the secretary can make mistakes, too, see Brief for Respondent Reed 42. Public disclosure can help cure the inadequacies of the verification and canvassing process.

Disclosure also helps prevent certain types of petition fraud otherwise difficult to detect, such as outright forgery

and "bait and switch" fraud, in which an individual signs the petition based on a misrepresentation of the underlying issue. See Brief for Respondent WFST 9–11, 53–54; cf. Brief for Massachusetts Gay and Lesbian Political Caucus et al. as *Amici Curiae* 18–22 (detailing "bait and switch" fraud in a petition drive in Massachusetts). The signer is in the best position to detect these types of fraud, and public disclosure can bring the issue to the signer's attention.

Public disclosure thus helps ensure that the only signatures counted are those that should be, and that the only referenda placed on the ballot are those that garner enough valid signatures. Public disclosure also promotes transparency and accountability in the electoral process to an extent other measures cannot. In light of the foregoing, we reject plaintiffs' argument and conclude that public disclosure of referendum petitions in general is substantially related to the important interest of preserving the integrity of the electoral process.[2]

## C

Plaintiffs' more significant objection is that "the strength of the governmental interest" does not "reflect the seriousness of the actual burden on First Amendment rights." *Davis*, 554 U. S., at ___ (slip op., at 18) (citing *Buckley*, 424 U. S., at 68, 71); see, *e.g.*, Brief for Petitioners 12–13, 30. According to plaintiffs, the objective of those seeking disclosure of the R–71 petition is not to prevent fraud, but to publicly identify those who had validly signed and to broadcast the signers' political views on the subject of the petition. Plaintiffs allege, for example, that several

——————

[2] JUSTICE THOMAS's contrary assessment of the relationship between the disclosure of referendum petitions generally and the State's interests in this case is based on his determination that strict scrutiny applies, *post*, at 5 (dissenting opinion), rather than the standard of review that we have concluded is appropriate, see *supra*, at 7.

groups plan to post the petitions in searchable form on the Internet, and then encourage other citizens to seek out the R–71 signers. See App. 11; Brief for Petitioners 8, 46–47.

Plaintiffs explain that once on the Internet, the petition signers' names and addresses "can be combined with publicly available phone numbers and maps," in what will effectively become a blueprint for harassment and intimidation. *Id.*, at 46. To support their claim that they will be subject to reprisals, plaintiffs cite examples from the history of a similar proposition in California, see, *e.g.*, *id.*, at 2–6, 31–32, and from the experience of one of the petition sponsors in this case, see App. 9.

In related contexts, we have explained that those resisting disclosure can prevail under the First Amendment if they can show "a reasonable probability that the compelled disclosure [of personal information] will subject them to threats, harassment, or reprisals from either Government officials or private parties." *Buckley, supra*, at 74; see also *Citizens United*, 558 U. S., at \_\_\_ (slip op., at 52). The question before us, however, is not whether PRA disclosure violates the First Amendment with respect to those who signed the R–71 petition, or other particularly controversial petitions. The question instead is whether such disclosure in general violates the First Amendment rights of those who sign referendum petitions.

The problem for plaintiffs is that their argument rests almost entirely on the specific harm they say would attend disclosure of the information on the R–71 petition, or on similarly controversial ones. See, *e.g.*, Brief for Petitioners 10, 26–29, 46, 56. But typical referendum petitions "concern tax policy, revenue, budget, or other state law issues." Brief for Respondent WFST 36 (listing referenda); see also App. 26 (stating that in recent years the State has received PRA requests for petitions supporting initiatives concerning limiting motor vehicle charges; government

regulation of private property; energy resource use by certain electric utilities; long-term care services for the elderly and persons with disabilities; and state, county, and city revenue); *id.*, at 26–27 (stating that in the past 20 years, referendum measures that have qualified for the ballot in the State concerned land-use regulation; unemployment insurance; charter public schools; and insurance coverage and benefits). Voters care about such issues, some quite deeply—but there is no reason to assume that any burdens imposed by disclosure of typical referendum petitions would be remotely like the burdens plaintiffs fear in this case.

Plaintiffs have offered little in response. They have provided us scant evidence or argument beyond the burdens they assert disclosure would impose on R–71 petition signers or the signers of other similarly controversial petitions. Indeed, what little plaintiffs do offer with respect to typical petitions in Washington hurts, not helps: Several other petitions in the State "have been subject to release in recent years," plaintiffs tell us, Brief for Petitioners 50, but apparently that release has come without incident. Cf. *Citizens United, supra*, at ___ (slip op., at 55) ("Citizens United has been disclosing its donors for years and has identified no instance of harassment or retaliation").

Faced with the State's unrebutted arguments that only modest burdens attend the disclosure of a typical petition, we must reject plaintiffs' broad challenge to the PRA. In doing so, we note—as we have in other election law disclosure cases—that upholding the law against a broad-based challenge does not foreclose a litigant's success in a narrower one. See *Buckley, supra*, at 74 ("minor parties" may be exempt from disclosure requirements if they can show "a reasonable probability that the compelled disclosure of a party's contributors' names will subject them to threats, harassment, or reprisals from either Government officials

or private parties"); *Citizens United, supra*, at \_\_\_ (slip op., at 54) (disclosure "would be unconstitutional as applied to an organization if there were a reasonable probability that the group's members would face threats, harassment, or reprisals if their names were disclosed" (citing *McConnell* v. *Federal Election Comm'n*, 540 U. S. 93, 198 (2003)). The secretary of state acknowledges that plaintiffs may press the narrower challenge in Count II of their complaint in proceedings pending before the District Court. Brief for Respondent Reed 17.

\*    \*    \*

We conclude that disclosure under the PRA would not violate the First Amendment with respect to referendum petitions in general and therefore affirm the judgment of the Court of Appeals.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 09–559

_____

JOHN DOE #1, ET AL., PETITIONERS *v.* SAM REED, WASHINGTON SECRETARY OF STATE, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 24, 2010]

JUSTICE BREYER, concurring.

In circumstances where, as here, "a law significantly implicates competing constitutionally protected interests in complex ways," the Court balances interests. *Nixon* v. *Shrink Missouri Government PAC*, 528 U. S. 377, 402 (2000) (BREYER, J., concurring). "And in practice that has meant asking whether the statute burdens any one such interest in a manner out of proportion to the statute's salutary effects upon the others." *Ibid.* As I read their opinions, this is what both the Court and JUSTICE STEVENS do. See *ante*, at 7 (opinion of the Court); *post*, at 2 (STEVENS, J., concurring in part and concurring in judgment). And for the reasons stated in those opinions (as well as many of the reasons discussed by JUSTICE SOTOMAYOR), I would uphold the statute challenged in this case. With this understanding, I join the opinion of the Court and JUSTICE STEVENS' opinion.

# SUPREME COURT OF THE UNITED STATES

No. 09–559

JOHN DOE #1, ET AL., PETITIONERS *v.* SAM REED,
WASHINGTON SECRETARY OF STATE, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 24, 2010]

JUSTICE ALITO, concurring.

The Court holds that the disclosure under the Washington Public Records Act (PRA), Wash. Rev. Code §42.56.001 *et seq.* (2008), of the names and addresses of persons who sign referendum petitions does not as a general matter violate the First Amendment, *ante*, at 13, and I agree with that conclusion. Many referendum petitions concern relatively uncontroversial matters, see *ante*, at 11–12, and plaintiffs have provided no reason to think that disclosure of signatory information in those contexts would significantly chill the willingness of voters to sign. Plaintiffs' facial challenge therefore must fail. See *ante*, at 2, 5.

Nonetheless, facially valid disclosure requirements can impose heavy burdens on First Amendment rights in individual cases. Acknowledging that reality, we have long held that speakers can obtain as-applied exemptions from disclosure requirements if they can show "a reasonable probability that the compelled disclosure of [personal information] will subject them to threats, harassment, or reprisals from either Government officials or private parties." *Buckley* v. *Valeo*, 424 U. S. 1, 74 (1976) *(per curiam);* see also *Citizens United* v. *Federal Election Comm'n*, 558 U. S. \_\_\_, \_\_\_ (2010) (slip op., at 52); *McConnell* v. *Federal Election Comm'n*, 540 U. S. 93, 197–198 (2003); *Brown* v. *Socialist Workers '74 Campaign Comm.*

*(Ohio)*, 459 U. S. 87, 93 (1982).  Because compelled disclo-sure can "burden the ability to speak," *Citizens United*, *supra*, at ___ (slip op., at 51), and "seriously infringe on privacy of association and belief guaranteed by the First Amendment," *Buckley*, *supra*, at 64, the as-applied exemp-tion plays a critical role in safeguarding First Amendment rights.

## I

The possibility of prevailing in an as-applied challenge provides adequate protection for First Amendment rights only if (1) speakers can obtain the exemption sufficiently far in advance to avoid chilling protected speech and (2) the showing necessary to obtain the exemption is not overly burdensome.  With respect to the first requirement, the as-applied exemption becomes practically worthless if speakers cannot obtain the exemption quickly and well in advance of speaking.  To avoid the possibility that a dis-closure requirement might chill the willingness of voters to sign a referendum petition (and thus burden a circula-tor's ability to collect the necessary number of signatures, cf. *Meyer* v. *Grant*, 486 U. S. 414, 423 (1988)), voters must have some assurance *at the time when they are presented with the petition* that their names and identifying infor-mation will not be released to the public.  The only way a circulator can provide such assurance, however, is if the circulator has sought and obtained an as-applied exemp-tion from the disclosure requirement well before circulat-ing the petition.  Otherwise, the best the circulator could do would be to tell voters that an exemption might be obtained at some point in the future.  Such speculation would often be insufficient to alleviate voters' concerns about the possibility of being subjected to threats, har-assment, or reprisals.  Cf. *Citizens United*, *supra*, at ___ (slip op., at 5–6) (THOMAS, J., concurring in part and dissenting in part).

Additionally, speakers must be able to obtain an as-applied exemption without clearing a high evidentiary hurdle. We acknowledged as much in *Buckley*, where we noted that "unduly strict requirements of proof could impose a heavy burden" on speech. 424 U. S., at 74. Recognizing that speakers "must be allowed sufficient flexibility in the proof of injury to assure a fair consideration of their claim," we emphasized that speakers "need show only a *reasonable probability*" that disclosure will lead to threats, harassment, or reprisals. *Ibid.* (emphasis added). We stated that speakers could rely on a wide array of evidence to meet that standard, including "specific evidence of past or present harassment of [group] members," "harassment directed against the organization itself," or a "pattern of threats or specific manifestations of public hostility." *Ibid.* Significantly, we also made clear that "[n]ew [groups] that have no history upon which to draw may be able to offer evidence of reprisals and threats directed against individuals or organizations holding similar views." *Ibid.* From its inception, therefore, the as-applied exemption has not imposed onerous burdens of proof on speakers who fear that disclosure might lead to harassment or intimidation.

## II

In light of those principles, the plaintiffs in this case have a strong argument that the PRA violates the First Amendment as applied to the Referendum 71 petition.

## A

Consider first the burdens on plaintiffs' First Amendment rights. The widespread harassment and intimidation suffered by supporters of California's Proposition 8 provides strong support for an as-applied exemption in the present case. See *Buckley*, *supra*, at 74 (explaining that speakers seeking as-applied relief from a disclosure re-

quirement can rely on "evidence of reprisals and threats
directed against individuals or organizations holding
similar views"). Proposition 8 amended the California
Constitution to provide that "[o]nly marriage between a
man and a woman is valid or recognized in California,"
Cal. Const., Art. I, §7.5, and plaintiffs submitted to the
District Court substantial evidence of the harassment
suffered by Proposition 8 supporters, see Declaration of
Scott F. Bieniek in No. C:09–5456 (WD Wash.), Exhs. 12,
13. Members of this Court have also noted that harass-
ment. See *Hollingsworth* v. *Perry*, 558 U. S. ___, ___
(2010) *(per curiam)* (slip op., at 2–3); *Citizens United*, 558
U. S., at ___ (slip op., at 2–3) (opinion of THOMAS, J.).
Indeed, if the evidence relating to Proposition 8 is not
sufficient to obtain an as-applied exemption in this case,
one may wonder whether that vehicle provides any mean-
ingful protection for the First Amendment rights of per-
sons who circulate and sign referendum and initiative
petitions.

What is more, when plaintiffs return to the District
Court, they will have the opportunity to develop evidence
of intimidation and harassment of Referendum 71 sup-
porters—an opportunity that was pretermitted because of
the District Court's decision to grant a preliminary injunc-
tion on count 1 of plaintiffs' complaint. See 661 F. Supp.
2d 1194, 1205–1206 (WD Wash. 2009); Tr. of Oral Arg. 40–
41. For example, plaintiffs allege that the campaign
manager for one of the plaintiff groups received threaten-
ing e-mails and phone calls, and that the threats were so
severe that the manager filed a complaint with the local
sheriff and had his children sleep in an interior room of
his home. App. 9–10.

## B

The inadequacy of the State's interests in compelling
public disclosure of referendum signatory information

further confirms that courts should be generous in grant-
ing as-applied relief in this context. See *Buckley*, *supra*, at
71 (recognizing that the weakness of the State's interests
in an individual case can require exempting speakers from
compelled disclosure); *Brown*, 459 U. S., at 92–93 (same).
As the Court notes, respondents rely on two interests to
justify compelled disclosure in this context: (1) providing
information to voters about who supports a referendum
petition; and (2) preserving the integrity of the referen-
dum process by detecting fraudulent and mistaken signa-
tures. *Ante*, at 8.

1

In my view, respondents' asserted informational interest
will not in any case be sufficient to trump the First
Amendment rights of signers and circulators who face a
threat of harassment. Respondents maintain that publicly
disclosing the names and addresses of referendum signa-
tories provides the voting public with "insight into
whether support for holding a vote comes predominantly
from particular interest groups, political or religious or-
ganizations, or other group[s] of citizens," and thus allows
voters to draw inferences about whether they should
support or oppose the referendum. Brief for Respondent
Washington Families Standing Together 58; see also Brief
for Respondent Reed 46–48. Additionally, respondents
argue that disclosure "allows Washington voters to engage
in discussion of referred measures with persons whose
acts secured the election and suspension of state law." *Id.*,
at 45; see also Brief for Respondent Washington Families
Standing Together 58.

The implications of accepting such an argument are
breathtaking. Were we to accept respondents' asserted
informational interest, the State would be free to require
petition signers to disclose all kinds of demographic infor-
mation, including the signer's race, religion, political

affiliation, sexual orientation, ethnic background, and interest-group memberships. Requiring such disclosures, however, runs headfirst into a half century of our case law, which firmly establishes that individuals have a right to privacy of belief and association. See *Rumsfeld* v. *Forum for Academic and Institutional Rights, Inc.*, 547 U. S. 47, 69 (2006); *Brown, supra*, at 91; *Buckley*, 424 U. S., at 64; *DeGregory* v. *Attorney General of N. H.*, 383 U. S. 825, 829 (1966); *Gibson* v. *Florida Legislative Investigation Comm.*, 372 U. S. 539, 544 (1963); *NAACP* v. *Alabama ex rel. Patterson*, 357 U. S. 449, 462 (1958). Indeed, the State's informational interest paints such a chilling picture of the role of government in our lives that at oral argument the Washington attorney general balked when confronted with the logical implications of accepting such an argument, conceding that the State could not require petition signers to disclose their religion or ethnicity. Tr. of Oral Arg. 37, 56.

Respondents' informational interest is no more legitimate when viewed as a means of providing the public with information needed to locate and contact supporters of a referendum. In the name of pursuing such an interest, the State would be free to require petition signers to disclose any information that would more easily enable members of the voting public to contact them and engage them in discussion, including telephone numbers, e-mail addresses, and Internet aliases. Once again, permitting the government to require speakers to disclose such information runs against the current of our associational privacy cases. But more important, when speakers are faced with a reasonable probability of harassment or intimidation, the State no longer has *any* interest in enabling the public to locate and contact supporters of a particular measure— for in that instance, disclosure becomes a means of facilitating harassment that impermissibly chills the exercise of First Amendment rights.

In this case, two groups proposed to place on the Internet the names and addresses of all those who signed Referendum 71, and it is alleged that their express aim was to encourage "uncomfortable conversation[s]." 661 F. Supp. 2d, at 1199 (internal quotation marks omitted). If this information is posted on the Internet, then anyone with access to a computer could compile a wealth of information about all of those persons, including in many cases all of the following: the names of their spouses and neighbors, their telephone numbers, directions to their homes, pictures of their homes, information about their homes (such as size, type of construction, purchase price, and mortgage amount), information about any motor vehicles that they own, any court case in which they were parties, any information posted on a social networking site, and newspaper articles in which their names appeared (including such things as wedding announcements, obituaries, and articles in local papers about their children's school and athletic activities). The potential that such information could be used for harassment is vast.

2

Respondents also maintain that the State has an interest in preserving the integrity of the referendum process and that public disclosure furthers that interest by helping the State detect fraudulent and mistaken signatures. I agree with the Court that preserving the integrity of the referendum process constitutes a sufficiently important state interest. *Ante*, at 8. But I harbor serious doubts as to whether public disclosure of signatory information serves that interest in a way that always "reflect[s] the seriousness of the actual burden on First Amendment rights." *Davis* v. *Federal Election Comm'n*, 554 U. S. \_\_\_, \_\_\_ (2008) (slip op., at 18).

*First*, the realities of Washington law undermine the State's argument that public disclosure is necessary to

ensure the integrity of the referendum process. The State of Washington first authorized voter initiatives via constitutional amendment in 1912, and the following year the Washington Legislature passed a statute specifying the particulars of the referendum process. See *State ex rel. Case* v. *Superior Ct. for Thurston Cty.*, 81 Wash. 623, 628, 143 P. 461, 462 (1914). Significantly, Washington's laws pertaining to initiatives and referenda did not then and do not now authorize the public disclosure of signatory information. See Wash. Rev. Code §29A.72.010 *et seq.;* 1913 Wash. Laws. pp. 418–437. Instead, the public disclosure requirement stems from the PRA, which was enacted in 1972 and which requires the public disclosure of state documents generally, not referendum documents specifically. See Wash. Rev. Code §42.56.001 *et seq.* Indeed, if anything, Washington's referenda and initiative laws suggest that signatory information should remain confidential: Outside observers are permitted to observe the secretary of state's verification and canvassing process only "so long as they make no record of the names, addresses, or other information on the petitions or related records during the verification process," §29A.72.230, and the State is required to destroy all those petitions that fail to qualify for the ballot, §29A.72.200.

*Second*, the State fails to come to grips with the fact that public disclosure of referendum signatory information is a relatively recent practice in Washington. Prior to the adoption of the PRA in 1972, the Washington attorney general took the view that referendum petitions were not subject to public disclosure. See Op. Wash. Atty. Gen. 55–57 No. 274, pp. 1–2 (May 28, 1956), online at http://www.atg.wa.gov/AGOOpinions/opinion.aspx?section =topic&id=10488 (all Internet materials as visited June 17, 2010, and available in Clerk of Court's case file) (declaring that public disclosure of initiative petitions would be "contrary to public policy" and would run contrary to "a

tendency on the part of the legislature to regard the sign-ing of an initiative petition as a matter concerning only the individual signers except in so far as necessary to safeguard against abuses of the privilege"). Indeed, the secretary of state represents on his Web site that even after the PRA was enacted, "various Secretary of State administrations took the position, from 1973 to 1998, that the personal information on petition sheets were NOT subject to disclosure." B. Zylstra, The Disclosure History of Petition Sheets (Sept. 17, 2009), online at http://blogs.sos.wa.gov/FromOurCorner/index.php/2009/09/the-disclosure-history-of-petition-sheets/. Although the secretary of state apparently changed this policy in the late 1990's, it appears that the secretary did not release *any* initiative petitions until 2006. *Ibid.* And to date, the secretary has released only a handful of petitions. *Ibid.;* App. 26. That history substantially undermines the State's assertion that public disclosure is necessary to ensure the integrity of the referendum process. For nearly a century, Washington's referendum process operated— and apparently operated successfully—without the public disclosure of signatory information. The State has failed to explain how circumstances have changed so dramati-cally in recent years that public disclosure is now required.

*Third*, the experiences of other States demonstrates that publicly disclosing the names and identifying information of referendum signatories is not necessary to protect against fraud and mistake. To give but one example, California has had more initiatives on the ballot than any other State save Oregon. See Initiative and Referendum Institute, Initiative Use, p. 1 (Feb. 2009), online at http://www.iandrinstitute.org/IRI%20Initiative%20Use%2 0%281904=2008%29.pdf. Nonetheless, California law explicitly protects the privacy of initiative and referendum signatories. See Cal. Elec. Code Ann. §18650 (West 2003);

Cal. Govt. Code Ann. §6253.5 (West 2008). It is thus entirely possible for a State to keep signatory information private and maintain a referendum and initiative process free from fraud.

*Finally*, Washington could easily and cheaply employ alternative mechanisms for protecting against fraud and mistake that would be far more protective of circulators' and signers' First Amendment rights. For example, the Washington attorney general represented to us at oral argument that "the Secretary of State's first step after receiving submitted petitions is to take them to his archiving section and to have them digitized." Tr. of Oral Arg. 30. With a digitized list, it should be relatively easy for the secretary to check for duplicate signatures on a referendum petition. And given that the secretary maintains a "centralized, uniform, interactive computerized statewide voter registration list that contains the name and registration information of every registered voter in the state," Wash. Rev. Code Ann. §29A.08.125(1) (West Supp. 2010), the secretary could use a computer program to cross-check the names and addresses on the petition with the names and addresses on the voter registration roles, thus ensuring the accuracy and legitimacy of each signature.

Additionally, using the digitized version of the referendum petition, the State could set up a simple system for Washington citizens to check whether their names have been fraudulently signed to a petition. For example, on his Web site, the secretary maintains an interface that allows voters to confirm their voter registration information simply by inputting their name and date of birth. See http://wei.secstate.wa.gov/osos/VoterVault/Pages/MyVote.aspx. Presumably the secretary could set up a similar interface for referendum petitions. Indeed, the process would seem to be all the more simple given that Washington requires a "unique identifier [to] be assigned to each registered voter in the state." §29A.08.125(4).

ALITO, J., concurring

\*     \*     \*

As-applied challenges to disclosure requirements play a critical role in protecting First Amendment freedoms. To give speech the breathing room it needs to flourish, prompt judicial remedies must be available well before the relevant speech occurs and the burden of proof must be low. In this case—both through analogy and through their own experiences—plaintiffs have a strong case that they are entitled to as-applied relief, and they will be able to pursue such relief before the District Court.

# SUPREME COURT OF THE UNITED STATES

No. 09–559

JOHN DOE #1, ET AL., PETITIONERS *v.* SAM REED, WASHINGTON SECRETARY OF STATE, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 24, 2010]

JUSTICE SOTOMAYOR, with whom JUSTICE STEVENS and JUSTICE GINSBURG join, concurring.

I write separately to emphasize a point implicit in the opinion of the Court and the concurring opinions of JUSTICE STEVENS, JUSTICE SCALIA, and JUSTICE BREYER: In assessing the countervailing interests at stake in this case, we must be mindful of the character of initiatives and referenda. These mechanisms of direct democracy are not compelled by the Federal Constitution. It is instead up to the people of each State, acting in their sovereign capacity, to decide whether and how to permit legislation by popular action. States enjoy "considerable leeway" to choose the subjects that are eligible for placement on the ballot and to specify the requirements for obtaining ballot access (*e.g.*, the number of signatures required, the time for submission, and the method of verification). *Buckley* v. *American Constitutional Law Foundation, Inc.*, 525 U. S. 182, 191 (1999). As the Court properly recognizes, each of these structural decisions "inevitably affects—at least to some degree—the individual's right" to speak about political issues and "to associate with others for political ends." *Anderson* v. *Celebrezze*, 460 U. S. 780, 788 (1983). For instance, requiring petition signers to be registered voters or to use their real names no doubt limits the ability or willingness of some individuals to undertake the expres-

sive act of signing a petition. Regulations of this nature, however, stand "a step removed from the communicative aspect of petitioning," and the ability of States to impose them can scarcely be doubted. *Buckley*, 525 U. S., at 215 (O'Connor, J., concurring in judgment in part and dissenting in part); see also *McIntyre* v. *Ohio Elections Comm'n*, 514 U. S. 334, 345 (1995) (contrasting measures to "control the mechanics of the electoral process" with the "regulation of pure speech"). It is by no means necessary for a State to prove that such "reasonable, nondiscriminatory restrictions" are narrowly tailored to its interests. *Anderson*, 460 U. S., at 788.

The Court today confirms that the State of Washington's decision to make referendum petition signatures available for public inspection falls squarely within the realm of permissible election-related regulations. Cf. *Buckley*, 525 U. S., at 200 (describing a state law requiring petition circulators to submit affidavits containing their names and addresses as "exemplif[ying] the type of regulation" that States may adopt). Public disclosure of the identity of petition signers, which is the rule in the overwhelming majority of States that use initiatives and referenda, advances States' vital interests in "[p]reserving the integrity of the electoral process, preventing corruption, and sustaining the active, alert responsibility of the individual citizen in a democracy for the wise conduct of government." *First Nat. Bank of Boston* v. *Bellotti*, 435 U. S. 765, 788–789 (1978) (internal quotation marks and alterations omitted); see also *Citizens United* v. *Federal Election Comm'n*, 558 U. S. ___, ___ (2010) (slip op., at 55) ("[T]ransparency enables the electorate to make informed decisions and give proper weight to different speakers and messages"); Brief for Respondent Washington Families Standing Together 34 (reporting that only one State exempts initiative and referendum petitions from public disclosure). In a society "in which the citizenry is the final

judge of the proper conduct of public business," openness in the democratic process is of "critical importance." *Cox Broadcasting Corp.* v. *Cohn*, 420 U. S. 469, 495 (1975); see also *post*, at 4 (SCALIA, J., concurring in judgment) (noting that "[t]he public nature of federal lawmaking is constitutionally required").

On the other side of the ledger, I view the burden of public disclosure on speech and associational rights as minimal in this context. As this Court has observed with respect to campaign-finance regulations, "disclosure requirements . . . 'do not prevent anyone from speaking.'" *Citizens United*, 558 U. S., at ___ (slip op., at 51). When it comes to initiatives and referenda, the impact of public disclosure on expressive interests is even more attenuated. While campaign-finance disclosure injects the government into what would otherwise have been private political activity, the process of legislating by referendum is inherently public. To qualify a referendum for the ballot, citizens are required to sign a petition and supply identifying information to the State. The act of signing typically occurs in public, and the circulators who collect and submit signatures ordinarily owe signers no guarantee of confidentiality. For persons with the "civic courage" to participate in this process, *post*, at 10 (opinion of SCALIA, J.), the State's decision to make accessible what they voluntarily place in the public sphere should not deter them from engaging in the expressive act of petition signing. Disclosure of the identity of petition signers, moreover, in no way directly impairs the ability of anyone to speak and associate for political ends either publicly or privately.

Given the relative weight of the interests at stake and the traditionally public nature of initiative and referendum processes, the Court rightly rejects petitioners' constitutional challenge to the State of Washington's petition disclosure regulations. These same considerations also

mean that any party attempting to challenge particular applications of the State's regulations will bear a heavy burden. Even when a referendum involves a particularly controversial subject and some petition signers fear harassment from nonstate actors, a State's important interests in "protect[ing] the integrity and reliability of the initiative process" remain undiminished, and the State retains significant discretion in advancing those interests. *Buckley*, 525 U. S., at 191. Likewise, because the expressive interests implicated by the act of petition signing are always modest, I find it difficult to see how any incremental disincentive to sign a petition would tip the constitutional balance. Case-specific relief may be available when a State selectively applies a facially neutral petition disclosure rule in a manner that discriminates based on the content of referenda or the viewpoint of petition signers, or in the rare circumstance in which disclosure poses a reasonable probability of serious and widespread harassment that the State is unwilling or unable to control. Cf. *NAACP* v. *Alabama ex rel. Patterson*, 357 U. S. 449 (1958). Allowing case-specific invalidation under a more forgiving standard would unduly diminish the substantial breathing room States are afforded to adopt and implement reasonable, nondiscriminatory measures like the disclosure requirement now at issue. Accordingly, courts presented with an as-applied challenge to a regulation authorizing the disclosure of referendum petitions should be deeply skeptical of any assertion that the Constitution, which embraces political transparency, compels States to conceal the identity of persons who seek to participate in lawmaking through a state-created referendum process. With this understanding, I join the opinion of the Court.

# SUPREME COURT OF THE UNITED STATES

No. 09–559

JOHN DOE #1, ET AL., PETITIONERS *v.* SAM REED, WASHINGTON SECRETARY OF STATE, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 24, 2010]

JUSTICE STEVENS, with whom JUSTICE BREYER joins, concurring in part and concurring in the judgment.

This is not a hard case. It is not about a restriction on voting or on speech and does not involve a classic disclosure requirement. Rather, the case concerns a neutral, nondiscriminatory policy of disclosing information already in the State's possession that, it has been alleged, might one day indirectly burden petition signatories. The burden imposed by Washington's application of the Public Records Act (PRA) to referendum petitions in the vast majority, if not all, its applications is not substantial. And the State has given a more than adequate justification for its choice.

For a number of reasons, the application of the PRA to referendum petitions does not substantially burden any individual's expression. First, it is not "a regulation of pure speech." *McIntyre* v. *Ohio Elections Comm'n*, 514 U. S. 334, 345 (1995); cf. *United States* v. *O'Brien*, 391 U. S. 367, 377 (1968). It does not prohibit expression, nor does it require that any person signing a petition disclose or say anything at all. See *McIntyre*, 514 U. S. 334. Nor does the State's disclosure alter the content of a speaker's message. See *id.*, at 342–343.

Second, any effect on speech that disclosure might have is minimal. The PRA does not necessarily make it more

difficult to circulate or obtain signatures on a petition, see
*Buckley* v. *American Constitutional Law Foundation, Inc.*,
525 U. S. 182, 193–196 (1999); *Meyer* v. *Grant*, 486 U. S.
414, 422–423 (1988), or to communicate one's views gen-
erally. Regardless of whether someone signs a referendum
petition, that person remains free to say anything to any-
one at any time. If disclosure indirectly burdens a
speaker, "the amount of speech covered" is small—only a
single, narrow message conveying one fact in one place,
*Watchtower Bible & Tract Soc. of N. Y., Inc.* v. *Village of
Stratton*, 536 U. S. 150, 165 (2002); cf. *Cox* v. *New Hamp-
shire*, 312 U. S. 569 (1941). And while the democratic act
of casting a ballot or signing a petition does serve an
expressive purpose, the act does not involve any "interac-
tive communication," *Meyer*, 486 U. S., at 422, and is "not
principally" a method of "individual expression of political
sentiment," *Timmons* v. *Twin Cities Area New Party*, 520
U. S. 351, 373 (1997) (STEVENS, J., dissenting); cf. *O'Brien*,
391 U. S., at 377.[1]

   Weighed against the possible burden on constitutional
rights are the State's justifications for its rule. In this
case, the State has posited a perfectly adequate justifica-
tion: an interest in deterring and detecting petition fraud.[2]
Given the pedigree of this interest and of similar regula-
tions, the State need not produce concrete evidence that
the PRA is the best way to prevent fraud. See *Crawford* v.

---

   [1] Although a "petition" is a classic means of political expression, the
type of petition at issue in this case is not merely a document on which
people are expressing their views but rather is a state-created forum with
a particular function: sorting those issues that have enough public
support to warrant limited space on a referendum ballot. Cf. *Widmar* v.
*Vincent*, 454 U. S. 263, 278 (1981) (STEVENS, J., concurring in judgment).

   [2] Washington also points out that its disclosure policy informs voters
about who supports the particular referendum. In certain election-law
contexts, this informational rationale (among others) may provide a
basis for regulation; in this case, there is no need to look beyond the
State's quite obvious antifraud interest.

*Marion County Election Bd.*, 553 U. S. 181, 191–200 (2008) (opinion of STEVENS, J.) (discussing voting fraud); *Nixon* v. *Shrink Missouri Government PAC*, 528 U. S. 377, 391 (2000) ("The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised"); see also *Timmons*, 520 U. S., at 375 (STEVENS, J., dissenting) (rejecting "imaginative [and] theoretical" justification supported only by "bare assertion").[3]  And there is more than enough evidence to support the State's election-integrity justification.  See *ante*, at 8–10 (opinion of the Court).

There remains the issue of petitioners' as-applied challenge.  As a matter of law, the Court is correct to keep open the possibility that in particular instances in which a policy such as the PRA burdens expression "by the public enmity attending publicity," *Brown* v. *Socialist Workers '74 Campaign Comm. (Ohio)*, 459 U. S. 87, 98 (1982), speakers may have a winning constitutional claim. "'[F]rom time to time throughout history,'" persecuted groups have been able "'to criticize oppressive practices

_____

[3] There is no reason to think that our ordinary presumption that the political branches are better suited than courts to weigh a policy's benefits and burdens is inapplicable in this case.  The degree to which we defer to a judgment by the political branches must vary up and down with the degree to which that judgment reflects considered, public-minded decisionmaking.  Thus, when a law appears to have been adopted without reasoned consideration, see, *e.g.*, *Salazar* v. *Buono*, 559 U. S. \_\_\_, \_\_\_–\_\_\_ (2010) (STEVENS, J., dissenting) (slip op., at 22–23), for discriminatory purposes, see, *e.g.*, *Bates* v. *Little Rock*, 361 U. S. 516, 517–518, 524–525 (1960), or to entrench political majorities, see, *e.g.*, *Vieth* v. *Jubelirer*, 541 U. S. 267, 317–319, 324–326, 332–333 (2004) (STEVENS, J., dissenting), we are less willing to defer to the institutional strengths of the legislature.  That one may call into question the process used to create a law is not a reason to "disregar[d]" "sufficiently strong," "valid[,] neutral justifications" for an otherwise "nondiscriminatory" policy.  *Crawford*, 553 U. S., at 204.  But it is a reason to examine more carefully the justifications for that measure.

and laws either anonymously or not at all.'" *McIntyre*, 514
U. S., at 342.[4]

In my view, this is unlikely to occur in cases involving
the PRA. Any burden on speech that petitioners posit is
speculative as well as indirect. For an as-applied chal-
lenge to a law such as the PRA to succeed, there would
have to be a significant threat of harassment directed at
those who sign the petition that cannot be mitigated by
law enforcement measures.[5] Moreover, the character of
the law challenged in a referendum does not, in itself,
affect the analysis. Debates about tax policy and regula-
tion of private property can become just as heated as
debates about domestic partnerships. And as a general
matter, it is very difficult to show that by later disclosing
the names of petition signatories, individuals will be less
willing to sign petitions. Just as we have in the past, I
would demand strong evidence before concluding that an
indirect and speculative chain of events imposes a sub-

-------

[4] JUSTICE SCALIA conceives of the issue as a right to anonymous
speech. See, *e.g.*, *post,* at 1 (opinion concurring in judgment). But our
decision in *McIntyre* posited no such freewheeling right. The Constitu-
tion protects "freedom of speech." Amdt. 1; see also *McIntyre*, 514 U. S.,
at 336 ("The question presented is whether [a] . . . statute that prohib-
its the distribution of anonymous campaign literature is a 'law . . .
abridging the freedom of speech' within the meaning of the First
Amendment"). That freedom can be burdened by a law that exposes
the speaker to fines, as much as it can be burdened by a law that
exposes a speaker to harassment, changes the content of his speech, or
prejudices others against his message. See *id.*, at 342. The right,
however, is the right to speak, not the right to speak without being
fined or the right to speak anonymously.

[5] A rare case may also arise in which the level of threat to any indi-
vidual is not quite so high but a State's disclosure would substantially
limit a group's ability to "garner the number of signatures necessary to
place [a] matter on the ballot," thereby "limiting [its] ability to make
the matter the focus of statewide discussion." *Meyer* v. *Grant,* 486 U. S.
414, 423 (1988).

stantial burden on speech.[6] A statute "is not to be upset upon hypothetical and unreal possibilities, if it would be good upon the facts as they are." *Pullman Co.* v. *Knott*, 235 U. S. 23, 26 (1914).

\*     \*     \*

Accordingly, I concur with the opinion of the Court to the extent that it is not inconsistent with my own, and I concur in the judgment.

-----

[6] See*, e.g.*, *Bates* v. *Little Rock*, 361 U. S., at 521–522, 523–524; *Buckley* v. *Valeo*, 424 U. S. 1, 69–72 (1976) *(per curiam); Brown* v. *Socialist Workers '74 Campaign Comm. (Ohio)*, 459 U. S. 87, 98–101 (1982); *Buckley* v. *American Constitutional Law Foundation, Inc.*, 525 U. S. 182, 197–198 (1999).

# SUPREME COURT OF THE UNITED STATES

No. 09–559

JOHN DOE #1, ET AL., PETITIONERS *v.* SAM REED,
WASHINGTON SECRETARY OF STATE, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 24, 2010]

JUSTICE SCALIA, concurring in the judgment.

Plaintiffs claim the First Amendment, as applied to the
States through the Fourteenth Amendment, forbids the
State of Washington to release to the public signed refer-
endum petitions, which they submitted to the State in
order to suspend operation of a law and put it to a popular
vote. I doubt whether signing a petition that has the
effect of suspending a law fits within "the freedom of
speech" at all. But even if, as the Court concludes, *ante*, at
5, it does, a long history of practice shows that the First
Amendment does not prohibit public disclosure.

I

We should not repeat and extend the mistake of *McIn-
tyre* v. *Ohio Elections Comm'n*, 514 U. S. 334 (1995).
There, with neither textual support nor precedents requir-
ing the result, the Court invalidated a form of election
regulation that had been widely used by the States since
the end of the 19th century. *Id.*, at 371 (SCALIA, J., dis-
senting). The Court held that an Ohio statute prohibiting
the distribution of anonymous campaign literature vio-
lated the First and Fourteenth Amendments.

Mrs. McIntyre sought a general right to "speak" anony-
mously about a referendum. Here, plaintiffs go one step
further—they seek a general right to participate anony-

mously in the referendum itself.[1] Referendum petitions are subject to public disclosure under the Public Records Act (PRA), Wash. Rev. Code §42.56.001 *et seq.*, which requires government agencies to "make available for public inspection and copying all public records," subject to certain exemptions not relevant here. §42.56.070(1) (2008). Plaintiffs contend that disclosure of the names, and other personal information included on the petitions, of those who took this legislative action violates their First Amendment right to anonymity.

Today's opinion acknowledges such a right, finding that it can be denied here only because of the State's interest in "preserving the integrity of the electoral process," *ante*, at 8. In my view this is not a matter for judicial interest-balancing. Our Nation's longstanding traditions of legislating and voting in public refute the claim that the First Amendment accords a right to anonymity in the performance of an act with governmental effect. "A governmental practice that has become general throughout the United

---

[1] Plaintiffs seem to disavow reliance on *McIntyre* v. *Ohio Elections Comm'n*, 514 U. S. 334 (1995), see Reply Brief for Petitioners 12. Certainly, there are differences between *McIntyre* and this case. Mrs. McIntyre was required to disclose her identity herself, by placing her name on her handbill. Here, plaintiffs do not object to signing their names to the referendum petition, where it can presumably be observed by later signers; they challenge only the later disclosure of that information by the State. But both cases are about public disclosure, and both involve a claim to anonymity under the First Amendment. If anything, the line plaintiffs seek to draw—which seeks a sort of *partial* anonymity—is stranger still.

JUSTICE STEVENS quibbles with the shorthand I use, and tries to rein in *McIntyre*'s holding, by saying that it did not create a "right to speak anonymously," *ante*, at 4, n. 4 (opinion concurring in part and concurring in judgment). But *McIntyre* used the same shorthand. See 514 U. S., at 357 ("[t]he right to remain anonymous"); *id.*, at 342 ("[t]he freedom to publish anonymously"); see also *ibid.* ("an author's decision to remain anonymous . . . is an aspect of the freedom of speech protected by the First Amendment").

States, and particularly one that has the validation of long, accepted usage, bears a strong presumption of constitutionality." *McIntyre, supra*, at 375 (SCALIA, J., dissenting).

## A

When a Washington voter signs a referendum petition subject to the PRA, he is acting as a legislator. The Washington Constitution vests "[t]he legislative authority" of the State in the legislature, but "the people reserve to themselves the power . . . to approve or reject at the polls any act, item, section, or part of any bill, act, or law passed by the legislature." Art. 2, §1. This "referendum" power of popular legislation is exercised by submitting a petition, in accordance with certain specifications, to the Washington secretary of state with valid signatures of registered voters in number equal to or exceeding four percent of the votes cast in the last gubernatorial election. §1(b); Wash. Rev. Code §29A.72.100, 130, 140, 150, 160 (2008).

The filing of a referendum petition that satisfies these requirements has two legal effects: (1) It requires the secretary to place the measure referred to the people on the ballot at the next general election; and (2) it suspends operation of the measure, causing it only to have effect 30 days after it is approved during that election. Art. 2, §1(d). See Brief for Respondent Sam Reed, Secretary of State of Washington 2–6. A voter who signs a referendum petition is therefore exercising legislative power because his signature, somewhat like a vote for or against a bill in the legislature, seeks to affect the legal force of the measure at issue.[2]

---

[2] The Court notes that "only *some* petition signing has legal effect." *Ante*, at 8, n. 1. That is true. Some petitions may never be submitted to the secretary; they are irrelevant here, since they will never be subject to the PRA. But some petitions that are submitted to the secretary may lack the requisite number of signatures. Even as to

Plaintiffs point to no precedent from this Court holding that legislating is protected by the First Amendment.[3] Nor do they identify historical evidence demonstrating that "the freedom of speech" the First Amendment codified encompassed a right to legislate without public disclosure. This should come as no surprise; the exercise of lawmaking power in the United States has traditionally been public.

The public nature of federal lawmaking is constitutionally required. Article I, §5, cl. 3 requires Congress to legislate in public: "Each House shall keep a Journal of its Proceedings, and from time to time publish the same, excepting such Parts as may in their Judgment require Secrecy; and the Yeas and Nays of the Members of either House on any question shall, at the Desire of one fifth of those Present, be entered on the Journal."[4] State constitu-

———————

those, the petition signer has exercised *his portion* of the legislative power when he signs the petition, much like a legislator who casts a losing vote.

[3] The Court quotes *Republican Party of Minn.* v. *White*, 536 U. S. 765, 788 (2002), which stated that a State "having 'cho[sen] to tap the energy and the legitimizing power of the democratic process, . . . must accord the participants in that process the First Amendment rights that attach to their roles.'" *Ante*, at 6. That is correct, but it is not on point. *White* involved a *prohibition on speaking* as a condition of running for judicial office. I do not suggest that a State could require legislators (or the citizen-legislators who participate in a referendum) to give up First Amendment rights unconnected with their act of legislating. The electioneering disclosure cases the Court cites, *ante*, at 7, are likewise not on point, since they involve disclosure requirements applied to political speech, not legislative action.

[4] The exception for "such Parts as may in their Judgment require Secrecy" was assuredly not designed to permit anonymous voting. It refers to details whose disclosure would threaten an important national interest. The similar clause in the Articles of Confederation created an exception to the journal requirement for parts of the proceedings "relating to treaties, alliances or military operations, as in [Congress's] judgment require secrecy." Art. IX. The Constitution's requirement is broader, but its object is obviously the same.

tions enacted around the time of the founding had similar provisions. See, *e.g.*, Ky. Const., Art. I, §20 (1792); Ga. Const., Art. I, §15 (1798). The desirability of public accountability was obvious. "[A]s to the votes of representatives and senators in Congress, no man has yet been bold enough to vindicate a secret or ballot vote, as either more safe or more wise, more promotive of independence in the members, or more beneficial to their constituents." 1 J. Story, Commentaries on the Constitution §841, p. 591 (4th ed. 1873).

Moreover, even when the people *asked* Congress for legislative changes—by exercising their constitutional right "to petition the Government for a redress of grievances," U. S. Const., Amdt. 1—they did so publicly. The petition was read aloud in Congress. Mazzone, Freedom's Associations, 77 Wash. L. Rev. 639, 726 (2002). The petitioner's name (when large groups were not involved), his request, and what action Congress had taken on the petition were consistently recorded in the House and Senate Journals. See, *e.g.*, Journal of the Senate, June 18, 1790, 1st Cong., 1st Sess., 163; Journal of the House of Representatives, Nov. 24, 1820, 16th Cong., 2d Sess., 32. Even when the people exercised legislative power directly, they did so not anonymously, but openly in town hall meetings. See generally J. Zimmerman, The New England Town Meeting (1999).

Petitioning the government and participating in the traditional town meeting were precursors of the modern initiative and referendum. Those innovations were modeled after similar devices used by the Swiss democracy in the 1800's, and were first used in the United States by South Dakota in 1898. See S. Piott, Giving Voters a Voice 1–3, 16 (2003). The most influential advocate of the initiative and referendum in the United States analogized the Swiss practice to the town meeting, because both "required open conduct of political affairs and free expression

of opinions." *Id.,* at 5 (discussing J. W. Sullivan, Direct Legislation by the Citizenship through the Initiative and Referendum (1892)). Plaintiffs' argument implies that the public nature of these practices, so longstanding and unquestioned, violated the freedom of speech. There is no historical support for such a claim.

### B

Legislating was not the only governmental act that was public in America. Voting was public until 1888 when the States began to adopt the Australian secret ballot. See *Burson* v. *Freeman*, 504 U. S. 191, 203 (1992) (plurality opinion). We have acknowledged the existence of a First Amendment interest in voting, see, *e.g.*, *Burdick* v. *Takushi*, 504 U. S. 428 (1992), but we have never said that it includes the right to vote anonymously. The history of voting in the United States completely undermines that claim.

Initially, the Colonies mostly continued the English traditions of voting by a show of hands or by voice—*viva voce* voting. *Burson*, *supra*, at 200; E. Evans, A History of the Australian Ballot System in the United States 1–6 (1917) (Evans). One scholar described the *viva voce* system as follows:

> "'The election judges, who were magistrates, sat upon a bench with their clerks before them. Where practicable, it was customary for the candidates to be present in person, and to occupy a seat at the side of the judges. As the voter appeared, his name was called out in a loud voice. The judges inquired, "John Jones (or Smith), for whom do you vote?"—for governor, or whatever was the office to be filled. He replied by proclaiming the name of his favorite. Then the clerks enrolled the vote, and the judges announced it as enrolled. The representative of the candidate for whom he voted arose, bowed, and thanked him aloud; and

his partisans often applauded.'" *Id.*, at 5 (quoting J. Wise, The End of An Era 55–56 (1899)).

See also R. Dinkin, A Study of Elections in the Original Thirteen States, 1776–1789, p. 101 (1982) (Dinkin).

Although there was variation, the election official would ordinarily compile a poll with the name and residence of each voter, and the name of the candidate for whom he voted. See C. Bishop, History of Elections in the American Colonies 160–64 (1893) (Bishop); P. Argersinger, Structure, Process, and Party: Essays in American Political History 47 (1992) (Argersinger). To prevent fraud, the Colonies in Rhode Island, New York, and New Jersey adopted the English rule that "copies of the poll must be delivered on demand to persons who were willing to pay a reasonable charge for the labor of writing them." Bishop 186. Some colonies allowed candidates to demand a copy of the poll, *ibid.*, and required the legislature to examine the poll in a contested election, *id.*, at 188–189. Thus, as in this case, the government not only publicly collected identifying information about who voted and for which candidate, it also disclosed that information to the public.

Any suggestion that *viva voce* voting infringed the accepted understanding of the pre-existing freedom of speech to which the First Amendment's text refers is refuted by the fact that several state constitutions that required or authorized *viva voce* voting *also* explicitly guaranteed the freedom of speech. See, *e.g.*, Ky. Const., Art. X, §7, Art. VI, §16 (1799); Ill. Const., Art. VIII, §22, Art. I, §28 (1818). Surely one constitutional provision did not render the other invalid.

Of course the practice of *viva voce* voting was gradually replaced with the paper ballot, which was thought to reduce fraud and undue influence. See Evans 1–6; Dinkin 101–106. There is no indication that the shift resulted from a sudden realization that public voting infringed

voters' freedom of speech, and the manner in which it occurred suggests the contrary. States adopted the paper ballot at different times, and some States changed methods multiple times. New York's 1777 Constitution, for example, explicitly provided for the State to switch between methods. Art. VI. Kentucky's 1792 Constitution required paper ballots, Art. III, §2, but its 1799 Constitution required *viva voce* voting, Art. VI, §16. The different voting methods simply reflected different views about how democracy should function. One scholar described Virginia's and Kentucky's steadfast use of *viva voce* voting through the Civil War as follows: "[I]n the appeal to unflinching manliness at the polls these two states insisted still that every voter should show at the hustings the courage of his personal conviction." Schouler, Evolution of the American Voter, 2 The American Historical Review 665, 671 (1897). See also *id.*, at 666–667 ("In Virginia and the other states in close affiliation with her this oral expression was vaunted as the privilege of the free-born voter, to show the faith that was in him by an outspoken announcement of his candidate").

The new paper ballots did not make voting anonymous. See Evans 10 ("[T]he ballot was not secret"); Argersinger 48 ("Certainly there were no legal provisions to ensure secrecy"). Initially, many States did not regulate the form of the paper ballot. See Evans 10; Argersinger 48–49. Taking advantage of this, political parties began printing ballots with their candidates' names on them. They used brightly colored paper and other distinctive markings so that the ballots could be recognized from a distance, making the votes public. See *Burson*, *supra*, at 200–201; Evans 10–11. Abuse of these unofficial paper ballots was rampant. The polling place had become an "open auction place" where votes could be freely bought or coerced. *Burson*, *supra*, at 202. Employers threatened employees. Party workers kept voters from the other party away from

the ballot box. Ballot peddlers paid voters and then watched them place the ballot in the box. See L. Fredman, The Australian Ballot: The Story of an American Reform 22–29 (1968); Argersinger 48–50. Thus, although some state courts said that voting by ballot was meant to be more secret than the public act of *viva voce* voting; and although some state constitutional requirements of ballot voting were held to guarantee ballot secrecy, thus prohibiting the numbering of ballots for voter identification purposes, see *Williams* v. *Stein*, 38 Ind. 89 (1871); *Brisbin* v. *Cleary*, 26 Minn. 107, 1 N. W. 825 (1879); in general, voting by ballot was by no means secret. Most important of all for present purposes, I am aware of no assertion of ballot secrecy that relied on federal or state constitutional guarantees of freedom of speech.

It was precisely discontent over the nonsecret nature of ballot voting, and the abuses that produced, which led to the States' adoption of the Australian secret ballot. New York and Massachusetts began that movement in 1888, and almost 90 percent of the States had followed suit by 1896. *Burson*, 504 U. S., at 203–205. But I am aware of no contention that the Australian system was required by the First Amendment (or the state counterparts). That would have been utterly implausible, since the inhabitants of the Colonies, the States, and the United States had found public voting entirely compatible with "the freedom of speech" for several centuries.

\*    \*    \*

The long history of public legislating and voting contradicts plaintiffs' claim that disclosure of petition signatures having legislative effect violates the First Amendment. As I said in *McIntyre*, "[w]here the meaning of a constitutional text (such as 'the freedom of speech') is unclear, the widespread and long-accepted practices of the American people are the best indication of what fundamental beliefs

it was intended to enshrine."  514 U. S., at 378 (dissenting opinion).  Just as the century-old practice of States' pro-hibiting anonymous electioneering was sufficient for me to reject the First Amendment claim to anonymity in *McIntyre*, the many-centuries-old practices of public legislating and voting are sufficient for me to reject plaintiffs' claim.

Plaintiffs raise concerns that the disclosure of petition signatures may lead to threats and intimidation.  Of course nothing prevents the people of Washington from keeping petition signatures secret to avoid that—just as nothing prevented the States from moving to the secret ballot.  But there is no constitutional basis for this Court to impose that course upon the States—or to insist (as today's opinion does) that it can only be avoided by the demonstration of a "sufficiently important governmental interest," *ante*, at 7 (internal quotation marks omitted).  And it may even be a bad idea to keep petition signatures secret.  There are laws against threats and intimidation; and harsh criticism, short of unlawful action, is a price our people have traditionally been willing to pay for self-governance.  Requiring people to stand up in public for their political acts fosters civic courage, without which democracy is doomed.  For my part, I do not look forward to a society which, thanks to the Supreme Court, cam-paigns anonymously *(McIntyre)* and even exercises the direct democracy of initiative and referendum hidden from public scrutiny and protected from the accountability of criticism.  This does not resemble the Home of the Brave.

# SUPREME COURT OF THE UNITED STATES

_____

No. 09–559

_____

JOHN DOE #1, ET AL., PETITIONERS *v.* SAM REED,
WASHINGTON SECRETARY OF STATE, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 24, 2010]

JUSTICE THOMAS, dissenting.

Just as "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy," *Purcell* v. *Gonzalez*, 549 U. S. 1, 4 (2006) *(per curiam)*, so too is citizen *participation* in those processes, which necessarily entails political speech and association under the First Amendment. In my view, compelled disclosure of signed referendum and initiative petitions[1] under the Washington Public Records Act (PRA), Wash. Rev. Code §42.56.001, *et seq.* (2008), severely burdens those rights and chills citizen participation in the referendum process. Given those burdens, I would hold that Washington's decision to subject all referendum petitions to public disclosure is unconstitutional because there will always be a less restrictive means by which Washington can vindicate its stated interest in preserving the integrity of its referendum process. I respectfully dissent.

_____

[1] Generally speaking, in a referendum, voters approve or reject an Act already passed by the legislature. In an initiative, voters adopt or reject an entirely new law, either a statute or a constitutional amendment. See T. Cronin, Direct Democracy: The Politics of Initiative, Referendum, and Recall 2 (1989).

## I

This case concerns the interaction of two distinct sets of Washington statutes. The first set, codified in Washington's Election Code, regulates the referendum and initiative process. These statutes require, among other things, that referendum signers write their names and addresses on petition sheets, and mandate that this information be disclosed to Washington's secretary of state for canvassing and verification. See, *e.g.,* §§29A.72.130, 29A.72.230 (2008). Petitioners do not contend that these requirements violate their First Amendment rights; that is, they do not argue that the Constitution allows them to support a referendum measure without disclosing their names *to the State.*

The second set of statutes—the PRA—is not a referendum or election regulation. Rather, the PRA requires disclosure of all nonexempt "public records" upon request by any person. See §§42.56.010(2), 42.56.070. Washington has concluded that signed referendum petitions are "public records" subject to disclosure under the PRA, and has "routinely disclosed petitions in response to public records requests." Brief for Respondent Reed 5–6.

Petitioners do not challenge the constitutionality of the PRA *generally.* They contend only that Washington violates their First Amendment rights by construing the PRA to apply to signed referendum petitions. See Brief for Petitioners 35–39. As the Court notes, the parties dispute whether this challenge is best conceived as a facial challenge or an as-applied challenge. See *ante*, at 5. In my view, the Court correctly concludes that petitioners must "satisfy our standards for a facial challenge" because their claim, and the relief that they seek, "reach beyond" their "particular circumstances." *Ibid.*

We typically disfavor facial challenges. See *Washington State Grange* v. *Washington State Republican Party,* 552 U. S. 442, 449 (2008). They "often rest on speculation,"

can lead courts unnecessarily to anticipate constitutional questions or formulate broad constitutional rules, and may prevent governmental officers from implementing laws "in a manner consistent with the Constitution." *Id.*, at 450–451. For those reasons, we rejected in *Washington State Grange* political parties' pre-enforcement facial challenge to a Washington initiative that allowed candidates in a primary election to self-designate their political party preference on the primary election ballot. See *id.*, at 458–459. Because the challenge was a pre-enforcement one, Washington "had no opportunity to implement" the initiative, *id.*, at 450, so the political parties' arguments that it violated their association rights all depended "on the possibility that voters will be confused as to the meaning of the party-preference designation," *id.*, at 454. Moreover, a facial challenge was inappropriate because the regulation did "not on its face impose a severe burden on political parties' associational rights." *Id.*, at 444.

Those considerations point in the opposite direction here. Washington's construction of the PRA "on its face impose[s] a severe burden," *ibid.*—compelled disclosure of privacy in political association protected by the First Amendment, see *infra*, at 4–5—on all referendum signers. And Washington has had several "opportunit[ies] to implement" the PRA's disclosure requirements with respect to initiative petitions. *Washington State Grange, supra,* at 450. Indeed, Washington admits that "[a]ll petitions for initiatives, referendum, recall, and candidate nomination are public records subject to disclosure." Brief for Respondent Reed 59; see also App. 26 (listing six completed requests for disclosure of signed initiative petitions since 2006). Washington thus has eliminated any "possibility" that referendum petition signers "will be confused as to" how the State will respond to a request under the PRA to disclose their names and addresses. *Washington State Grange*, 552 U. S., at 454.

Accordingly, I would consider petitioners' facial challenge here. For purposes of this case, I will assume that to prevail, petitioners must satisfy our most rigorous standard, and show that there is "'no set of circumstances . . . under which the'" PRA could be constitutionally applied to a referendum or initiative petition, "*i.e.*, that the [PRA] is unconstitutional in all of its applications," *id.,* at 449 (quoting *United States* v. *Salerno*, 481 U. S. 739, 745 (1987)).

## II

### A

The Court correctly concludes that "an individual expresses" a "political view" by signing a referendum petition. *Ante*, at 5. The Court also rightly rejects the baseless argument that such expressive activity falls "outside the scope of the First Amendment" merely because "it has legal effect in the electoral process." *Ante*, at 6. Yet, the Court does not acknowledge the full constitutional implications of these conclusions.

The expressive political activity of signing a referendum petition is a paradigmatic example of "the practice of persons sharing common views banding together to achieve a common end." *Citizens Against Rent Control/Coalition for Fair Housing* v. *Berkeley*, 454 U. S. 290, 294 (1981). A referendum supported by only one person's signature is a nullity; it will never be placed on the ballot. The Doe petitioners recognized as much when they—and more than 120,000 other Washingtonians, see *ante*, at 3— joined with petitioner Protect Marriage Washington, "a state political action committee" organized under §42.17.040, to effect Protect Marriage Washington's "major purpose" of collecting enough valid signatures to place Referendum 71 on the general election ballot. App. to Pet. for Cert. 29a. For these reasons, signing a referendum petition amounts to "'political association'" protected by

the First Amendment. *Citizens Against Rent Control*, *supra*, at 295 (quoting *Buckley* v. *Valeo*, 424 U. S. 1, 15 (1976) *(per curiam)*).

This Court has long recognized the "vital relationship between" political association "and privacy in one's associations," *NAACP* v. *Alabama ex rel. Patterson*, 357 U. S. 449, 462 (1958), and held that "[t]he Constitution protects against the compelled disclosure of political associations and beliefs," *Brown* v. *Socialist Workers '74 Campaign Comm. (Ohio)*, 459 U. S. 87, 91 (1982). This constitutional protection "yield[s] only to a subordinating interest of the State that is compelling, and then only if there is a substantial relation between the information sought and an overriding and compelling state interest." *Id.*, at 91–92 (internal quotation marks, citations, and brackets omitted). Thus, unlike the Court, I read our precedents to require application of strict scrutiny to laws that compel disclosure of protected First Amendment association. *Buckley* v. *American Constitutional Law Foundation, Inc.*, 525 U. S. 182, 206, 212 (1999) *(ACLF)* (THOMAS, J., concurring in judgment). Under that standard, a disclosure requirement passes constitutional muster only if it is narrowly tailored—*i.e.*, the least restrictive means—to serve a compelling state interest. See *id.*, at 206.

B

Washington's application of the PRA to a referendum petition does not survive strict scrutiny.

1

Washington first contends that it has a compelling interest in "transparency and accountability," which it claims encompasses several subordinate interests: preserving the integrity of its election process, preventing corruption, deterring fraud, and correcting mistakes by the secretary of state or by petition signers. See Brief for

Respondent Reed 40–42; 57–59.

It is true that a State has a substantial interest in regulating its referendum and initiative processes "to protect the[ir] integrity and reliability." *ACLF*, 525 U. S., at 191. But Washington points to no precedent from this Court recognizing "correcting errors" as a distinct compelling interest that could support disclosure regulations. And our cases strongly suggest that preventing corruption and deterring fraud bear less weight in this particular electoral context: the signature-gathering stage of a referendum or initiative drive. The Court has twice observed that "'the risk of fraud or corruption, or the appearance thereof, is more remote at the petition stage of an initiative than at the time of balloting.'" *Id.,* at 203 (quoting *Meyer* v. *Grant*, 486 U. S. 414, 427 (1988)). Similarly, because "[r]eferenda are held on issues, not candidates for public office," the "risk of corruption perceived in cases involving candidate elections simply is not present in a popular vote on a public issue." *First Nat. Bank of Boston* v. *Bellotti*, 435 U. S. 765, 790 (1978) (citations omitted).

We should not abandon those principles merely because Washington and its *amici* can point to a mere eight instances of initiative-related fraud, see Brief for Respondent Reed 42; Brief for State of Ohio et al. as *Amici Curiae* 22–24, among the 809 initiative measures placed on state ballots in this country between 1988 and 2008, see Initiative and Referendum Institute, Initiative Use 2 (Feb. 2009), online at http://www.iandrinstitute.org/ IRI%20Initiative%20Use%20(1904-2008).pdf (as visited June 21, 2010, and available in Clerk of Court's case file). If anything, these meager figures reinforce the conclusion that the risks of fraud or corruption in the initiative and referendum process are remote and thereby undermine Washington's claim that those two interests should be considered compelling for purposes of strict scrutiny.

Thus, I am not persuaded that Washington's interest in

protecting the integrity and reliability of its referendum process, as the State has defined that interest, is compelling. But I need not answer that question here. Even assuming the interest is compelling, on-demand disclosure of a referendum petition to any person under the PRA is "a blunderbuss approach" to furthering that interest, *Colorado Republican Federal Campaign Comm.* v. *Federal Election Comm'n*, 518 U. S. 604, 642 (1996) (THOMAS, J., concurring in judgment and dissenting in part) (internal quotation marks omitted), not the least restrictive means of doing so. The events that prompted petitioners' complaint in this case demonstrate as much.

As Washington explained during oral argument, after the secretary of state receives signed referendum petitions, his "first step . . . is to take them to his archiving section and to have them digitized. As soon as they're digitized, they're available on disks for anyone who requests them" under the PRA. Tr. of Oral Arg. 30. In this case, two organizations announced their intention to obtain the digitized names and addresses of referendum signers and post them "online, in a searchable format." *Ante*, at 3.

There is no apparent reason why Washington must broadly disclose referendum signers' names and addresses in this manner to vindicate the interest that it invokes here. Washington—which is in possession of that information because of referendum regulations that petitioners do not challenge, see *supra*, at 2—could put the names and addresses of referendum signers into a similar electronic database that state employees could search *without* subjecting the name and address of each signer to wholesale public disclosure. The secretary could electronically cross-reference the referendum database against the "statewide voter registration list" contained in Washington's "state-

wide voter registration database," §29A.08.651(1),[2] to ensure that each referendum signer meets Washington's residency and voter registration requirements, see §29A.72.130. Doing so presumably would drastically reduce or eliminate possible errors or mistakes that Washington argues the secretary *might* make, see Brief for Respondent Reed 42, since it would allow the secretary to verify virtually all of the signatures instead of the mere "3 to 5%" he "ordinarily checks," *ante*, at 9 (internal quotation marks omitted).[3]

An electronic referendum database would also enable the secretary to determine whether multiple entries correspond to a single registered voter, thereby detecting whether a voter had signed the petition more than once. In addition, the database would protect victims of "forgery" or "'bait and switch' fraud." *Ibid.* In Washington, "a unique identifier is assigned to each legally registered voter in the state." §29A.08.651(4). Washington could create a Web site, linked to the electronic referendum database, where a voter concerned that his name had been fraudulently signed could conduct a search using his unique identifier to ensure that his name was absent from the database—without requiring disclosure of the names and addresses of all the voluntary, legitimate signers.

Washington admits that creating this sort of electronic referendum database "could be done." Tr. of Oral Arg. 51. Implementing such a system would not place a heavy burden on Washington; "the Secretary of State's staff"

––––––––––

[2] Under Washington law, this "computerized list must serve as the single system for storing and maintaining the official list of registered voters throughout the state" and "must contain the name and registration information of every legally registered voter in the state." Wash. Rev. Code §§29A.08.651(2)–(3) (2008).

[3] See §29A.72.230 (permitting the secretary of state to verify and canvass referendum petitions using approved statistical sampling methods).

already uses an "electronic voter registration database" in its "verification process." *Id.*, at 50.

Washington nevertheless contends that its citizens must "have access to public records . . . to independently evaluate whether the Secretary properly determined to certify or not to certify a referendum to the ballot." Brief for Respondent Reed 41. "[W]ithout the access to signed petitions that the PRA provides," Washington argues, its "citizens could not fulfill their role as the final judge of public business." *Ibid.* (internal quotation marks omitted).

But Washington's Election Code already gives Washington voters access to referendum petition data. Under §29A.72.230, "[t]he verification and canvass of signatures on the [referendum] petition may be observed by persons representing the advocates and opponents of the proposed measure so long as they make no record of the names, addresses, or other information on the petitions or related records except upon" court order. Each side is entitled to at least two such observers, although the secretary may increase that number if, in his opinion, doing so would not "cause undue delay or disruption of the verification process." *Ibid.*

Washington does not explain why this existing access, which petitioners do not challenge here, is insufficient to permit its citizens to oversee the verification process under §29A.72.230, or to decide intelligently whether to pursue a court challenge under §29A.72.240. Moreover, if Washington had implemented the more narrowly tailored electronic referendum database discussed above, observers could see the secretary of state's employees examine the data using exactly the same techniques they would use if the data were released to them under the PRA. Obtaining a digitized list to navigate on their own computer would not allow an observer to learn any additional information.

Washington law also contains several other measures that preserve the integrity of the referendum process.

First, it is a crime in Washington to forge a signature on a referendum petition, or to knowingly sign one more than once. See §29A.84.230. Second, referendum supporters must gather a large number of valid signatures—four percent of the votes cast for Governor in the immediately preceding gubernatorial election—to place a referendum petition on the ballot. §29A.72.150. Third, Washington's required referendum petition form limits each petition to a single subject. See §29A.72.130. Fourth, a large, plain-English warning must appear at the top of the referendum petition, alerting signers to the law's requirements. See §29A.72.140. Fifth, Washington prescribes the text of the declaration that a circulator must submit along with the signed petition sheets. See §29A.72.130. Sixth, Washington prescribes verification and canvassing methods. See §29A.72.230.

The Court's dismissive treatment of those provisions, see *ante,* at 9, is perplexing, given the analysis that the Court endorsed in *ACLF.* There, the Court held that two disclosure requirements governing Colorado's initiative process were unconstitutional, see 525 U. S., at 186–187, specifically finding that they were "not warranted by the state interests (administrative efficiency, fraud detection, informing voters) alleged to justify" them, and emphasizing that its "judgment [wa]s informed by other means Colorado employs to accomplish its regulatory purposes." *Id.*, at 192. The entire last section of the Court's opinion detailed those "less problematic measures" by which Colorado "can *and d[id]* meet" its "substantial interests in regulating the ballot-initiative process." *Id.*, at 204 (emphasis added). With one exception—a law deeming an initiative void if the circulator violated any law applicable to the circulation process—those Colorado laws correspond exactly to the Washington regulatory requirements listed above. See *id.,* at 205. Including the observer provision, §29A.72.230, and the provision permitting court review of

the secretary's decision to certify (or not to certify) a referendum petition, §29A.72.240, Washington thus appears to provide even more of the "less problematic measures" than Colorado did to "protect the integrity of the initiative process," *ACLF*, *supra,* at 204, and I see no reason why Washington's identical provisions should not "inform" the analysis here.

It is readily apparent that Washington can vindicate its stated interest in "transparency and accountability" through a number of more narrowly tailored means than wholesale public disclosure. Accordingly, this interest cannot justify applying the PRA to a referendum petition.

2

Washington also contends that it has a compelling interest in "providing relevant information to Washington voters," and that on-demand disclosure to the public is a narrowly tailored means of furthering that interest. Brief for Respondent Reed 44. This argument is easily dispatched, since this Court has already rejected it in a similar context.

In *McIntyre* v. *Ohio Elections Comm'n*, 514 U. S. 334 (1995), the Court held that an Ohio law prohibiting anonymous political pamphleting violated the First Amendment. One of the interests Ohio had invoked to justify that law was identical to Washington's here: the "interest in providing the electorate with relevant information." *Id.*, at 348. The Court called that interest "plainly insufficient to support the constitutionality of [Ohio's] disclosure requirement." *Id.*, at 349. "The simple interest in providing voters with additional relevant information does not justify a state requirement that a writer make statements or disclosures she would otherwise omit." *Id.*, at 348. "Don't underestimate the common man," we advised. *Id.*, at 348, n. 11 (internal quotation marks omitted).

> "People are intelligent enough to evaluate the source of an anonymous writing.  They can see it is anonymous.  They know it is anonymous.  They can evaluate its anonymity along with its message. . . . And then, once they have done so, it is for them to decide what is 'responsible,' what is valuable, and what is truth."  *Ibid.* (internal quotation marks omitted).

See also *Bellotti*, 435 U. S., at 777 ("The inherent worth of the speech in terms of its capacity for informing the public does not depend upon the identity of its source").

This observation applies equally to referendum measures.  People are intelligent enough to evaluate the merits of a referendum without knowing who supported it.  Thus, just as this informational interest did not justify the Ohio law in *McIntyre*, it does not justify applying the PRA to referendum petitions.

### C

The foregoing analysis applies in every case involving disclosure of a referendum measure's supporters, as it must for petitioners' facial challenge to succeed.  See *Washington State Grange*, 552 U. S., at 449 (quoting *Salerno*, 481 U. S., at 745).  Washington does not argue that the strength of its transparency and accountability interest rises or falls based on the *topic* of a referendum.  Nor would such an argument be convincing.  We have no basis to assume that Washington's interest in maintaining the integrity of its referendum process is high for a charter-school referendum but low for an unemployment insurance referendum, or that a library or land-use referendum is more likely to be a target of fraud or corruption than a referendum on insurance coverage and benefits.  See *ante*, at 11–12.  The strength of Washington's interest remains constant across all types of referendum measures.

So too does the strength of a signer's First Amendment interest.  The First Amendment rights at issue here are

associational rights, and a long, unbroken line of this Court's precedents holds that privacy of association is protected under the First Amendment. See *supra*, at 4–5. The loss of associational privacy that comes with disclosing referendum petitions to the general public under the PRA constitutes the same harm as to each signer of each referendum, regardless of the topic. To be sure, a referendum signer may be more willing to disclose to the general public his political association with persons signing certain referendum measures than his association with others. But that choice belongs to the voter; the State may not make it for him by ascribing a lower level of First Amendment protection to an associational interest that some think a voter may be (or should be) more willing to disclose. Cf. *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 828 (1995) ("In the realm of private speech or expression, government regulation may not favor one speaker over another").

Finally, the less restrictive means available to vindicate Washington's transparency and accountability interest can be employed for all referendum measures, regardless of topic. There is nothing measure-specific about an electronic database or additional observers. And the forgery prohibition and other existing requirements in Washington law that help "protect the integrity of the initiative process," *ACLF*, 525 U. S., at 204, apply equally to all referendum measures.

Because the strength of Washington's interest in transparency and a signer's individual First Amendment interest in privacy of political association remain constant across all referendum topics, and because less restrictive means to protect the integrity of the referendum process are not topic specific, I would hold that on-demand public disclosure of referendum petitions under the PRA is not narrowly tailored for any referendum.

## III

Significant practical problems will result from requiring as-applied challenges to protect referendum signers' constitutional rights.

## A

The Court's approach will "require substantial litigation over an extended time" before a potential signer of any referendum will learn whether, if he signs a referendum, his associational privacy right will remain intact. *Citizens United* v. *Federal Election Comm'n*, 558 U. S. ___, ___ (2010) (slip op., at 9). And the tenacious litigant's reward for trying to protect his First Amendment rights? An "interpretive process [that] itself would create an inevitable, pervasive, and serious risk of chilling protected speech pending the drawing of fine distinctions that, in the end, would themselves be questionable." *Id.*, at ___ (slip op., at 9–10). The large number of such fine and questionable distinctions in these types of cases reinforces my view that as-applied challenges provide no more than "a hollow assurance" that referendum signers' First Amendment rights will be protected. *Id.*, at __ (slip op., at 5) (THOMAS, J., concurring in part and dissenting in part). Consider just a few examples.

In Washington, a referendum sponsor must file the proposed referendum with the secretary of state before collecting signatures. See §29A.72.010. May the sponsor seek an injunction against disclosure through an as-applied challenge before filing the proposed measure, or simultaneously with its filing? Because signature-gathering will not have started, the sponsor will not be able to present any evidence specific to signers or potential signers of *that particular referendum* showing "a reasonable probability that the compelled disclosure [of personal information] will subject them to threats, harassment, or reprisals from either Government officials or private

parties." *Ante*, at 11 (internal quotation marks omitted). Thus, to succeed at that stage of litigation, plaintiffs must point to (at least) one other instance of harassment arising from a similar referendum. The Court has never held that such evidence would be acceptable; but if it is, that necessarily means that some signers, at some point, will have suffered actual "threats, harassment, and reprisals" for engaging in protected First Amendment activity.

If the sponsor must wait at least until signature-gathering has started on *his* referendum to file an as-applied challenge, it is still unclear what sort of evidence of "threats, harassment, or reprisals" directed toward *his* supporters would satisfy the Court's standard. How many instances of "threats, harassment or reprisals" must a signer endure before a court may grant relief on an as-applied challenge? And how dispersed throughout the group of the necessary 120,000 signers, see *ante*, at 3, must these threats be?

More importantly, the Court's standard does not appear to require *actual* "threats, harassment, or reprisals," but merely a "*'reasonable probability'*" that disclosure of the signers' names and addresses will lead to such activity. *Ante*, at 11 (emphasis added). What sort of evidence suffices to satisfy this apparently more relaxed, though perhaps more elusive, standard? Does one instance of actual harassment directed toward one signer mean that the "reasonable probability" requirement is met? And again, how widespread must this "reasonable probability" be? The Court does not answer any of these questions, leaving a vacuum to be filled on a case-by-case basis. This will, no doubt, result in the "drawing of" arbitrary and "questionable" "fine distinctions" by even the most well-intentioned district or circuit judge. *Citizens United*, 558 U. S., at ___ (slip op., at 9–10).

## B

In addition, as I have previously explained, the state of technology today creates at least *some* probability that signers of every referendum will be subjected to threats, harassment, or reprisals if their personal information is disclosed. "'[T]he advent of the Internet' enables" rapid dissemination of "'the information needed' to" threaten or harass every referendum signer. *Id.,* at ___ (slip op., at 6) (opinion of THOMAS, J.). "Thus, 'disclosure permits citizens . . . to react to the speech of [their political opponents] in a proper'—or undeniably *improper*—'way' long before a plaintiff could prevail on an as-applied challenge." *Ibid.*

The Court apparently disagrees, asserting that "there is no reason to assume that any burdens imposed by disclosure of typical referendum petitions would be remotely like the burdens plaintiffs fear in this case." *Ante*, at 12. That conclusion rests on the premise that some referendum measures are so benign that the fact of public disclosure will not chill protected First Amendment activity. I am not convinced that this premise is correct.

The historical evidence shows that the referendum and initiative process first gained popularity as a means of "provid[ing] an occasional safety valve for interests that failed to get a fair hearing in the legislatures." T. Cronin, Direct Democracy: The Politics of Initiative, Referendum, and Recall 59 (1989). Unsurprisingly, such interests tended to be controversial by nature. Early examples include "the single tax, prohibition, women's suffrage, prolabor legislation, and the graduated income tax." *Id.*, at 58. And proponents of initiative measures tended to include politically marginalized groups such as the "Farmer's Alliance" in rural states; "[t]housands of labor federations, notably the miners"; and "the Women's Suffrage Association," which "saw the initiative and referendum as a possible new means to overcome" repeated failed attempts in state legislatures to secure for women the

right to vote. *Id.*, at 50–51.

These characteristics of initiative and referendum drives persist today. Consider, for example, the goal of increasing ethics in government—a seemingly laudable and unobjectionable goal. So thought some citizens of Utah, who, frustrated with the state legislature's failure to pass ethics laws commensurate with their preferences, filed a "21-page initiative target[ing] legislative conduct with a broad array of reforms that would significantly change how business gets done on Utah's Capitol Hill." McKitrick, Suit Demands Secrecy for Ethics Petition Signers, Salt Lake Tribune, Apr. 15, 2010, p. A4 (hereinafter Salt Lake Tribune). But Utah law provides that "[i]nitiative packets," which contain the names and addresses (and, in some cases, birthdates) of petition signers, "are public once they are delivered to the county clerks" for verification and canvassing. Utah Code Ann. §20A–7–206(7) (2009 Lexis Supp. Pamphlet).

The attorneys sponsoring that initiative moved for an injunction to prevent disclosure of the initiative packets under §20A–7–206(7) because, they claimed, "'[t]he [state] Republican Party has said it will target our folks.'" Salt Lake Tribune, at A4. According to these attorneys, a facially benign initiative may well result in political retribution and retaliation in a State where Republicans currently hold the offices of Governor, Lieutenant Governor, attorney general, state treasurer, state auditor, and a supermajority in both the Utah House of Representatives (71%) and the Utah Senate (72%), see State Yellow Book: Who's Who in the Executive and Legislative Branches of the 50 State Governments 650–651, 1292–1294 (Spring 2010), as well as four of the five seats in the State's delegation to the United States Congress, see GPO, 2009–2010 Official Congressional Directory, 111th Cong., pp. 299, 307 (2009).

The difficulty in predicting which referendum measures

will prove controversial—combined with Washington's
default position that signed referendum petitions will be
disclosed on-demand, thereby allowing anyone to place
this information on the Internet for broad dissemination—
raises the significant probability that today's decision will
"inhibit the exercise of legitimate First Amendment activ-
ity" with respect to referendum and initiative petitions.
*Colorado Republican,* 518 U. S., at 634 (THOMAS, J., con-
curring in judgment and dissenting in part). "[D]isclosure
requirements enable private citizens and elected officials
to implement political strategies *specifically calculated* to
curtail campaign-related activity and prevent the lawful,
peaceful exercise of First Amendment rights." *Citizens
United*, 558 U. S., at ___ (slip op., at 5) (THOMAS, J., con-
curring in part and dissenting in part). Our cases have
long recognized this reality;[4] as the Court recently reiter-
ated, the First Amendment does not require "case-by-case
determinations" if "archetypical" First Amendment rights
"would be chilled in the meantime." *Id.,* at ___ (slip op.,
at 12).

This chill in protected First Amendment activity harms
others besides the dissuaded signer. We have already
expressed deep skepticism about restrictions that "mak[e]
it less likely that" a referendum "will garner the number
of signatures necessary to place the matter on the ballot,

_____

[4] See, *e.g., NAACP* v. *Alabama ex rel. Patterson*, 357 U. S. 449, 462
(1958) (noting the "hardly . . . novel perception that compelled disclo-
sure of affiliation with groups engaged in advocacy may constitute" an
"effective . . . restraint on freedom of association"); *Bates* v. *Little Rock*,
361 U. S. 516, 523 (1960) ("Freedoms such as" the "freedom of associa-
tion for the purpose of advancing ideas and airing grievances" are
"protected not only against heavy-handed frontal attack, but also from
being stifled by more subtle government interference"); see also *id.*, at
528 (Black and Douglas, JJ., concurring) ("First Amendment rights are
beyond abridgment either by legislation that directly restrains their
exercise or by suppression or impairment through harassment, hu-
miliation, or *exposure by government*" (emphasis added)).

thus limiting [the] ability to make the matter the focus of statewide discussion." *Meyer*, 486 U. S., at 423. Such restrictions "inevitabl[y] . . . reduc[e] the total quantum of speech on a public issue." *Ibid.* The very public that the PRA is supposed to serve is thus harmed by the way Washington implements that statute here.

\*    \*    \*

Petitioners do not argue that the Constitution gives supporters of referendum petitions a right to act without *anyone* knowing their identities. Thus, Washington's requirements that referendum supporters sign their names and addresses to a referendum petition, and that this information be disclosed to the State for canvassing and verification, see Wash. Rev. Code §29A.72.230, are not at issue. And, petitioners do not contend that Washington's citizens may *never* obtain access to referendum data. Thus, Washington's rules allowing access to at least two representative observers from each side, see *ibid.*, and authorizing courts to review the secretary of state's verification and canvassing decision if those observers are dissatisfied with the secretary's decision, see §29A.72.240, are also not in question.

The Court is asked to assess the constitutionality of the PRA only with regard to referendum petitions. The question before us is whether *all* signers of *all* referendum petitions must resort to "substantial litigation over an extended time," *Citizens United*, *supra*, at ___ (slip op., at 9), to prevent Washington from trenching on their protected First Amendment rights by subjecting their referendum-petition signatures to on-demand public disclosure. In my view, they need not.